UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
AUDRA HYEK,

                              Plaintiff,          **MEMORANDUM & ORDER**
                                                  07-CV-4825 (DRH) (AKT)

              - against -

FIELD SUPPORT SERVICES, INC.,

                              Defendant.
-----------------------------------------------------------X
**A P P E A R A N C E S :**

**KARPF, KARPF & VIRANT, P.C.**
Attorneys for Plaintiff
140 Broadway, 46th Floor
New York, NY 10005
By: Adam C. Virant, Esq.

**LITTLER MENDELSON, P.C.**
Attorneys for Defendant
290 Broadhollow Road, Suite 305
Melville, NY 11747
By: L. Susan Scelzo Slavin, Esq.
     Lisa M. Griffith, Esq.

**HURLEY, District Judge:**

          Plaintiff Audra Hyek ("Plaintiff") filed the present action against her former

employer Defendant Field Support Services, Inc. ("FSSI" or "Defendant") alleging that she was

discriminated against on the basis of her gender in violation of Title VII of the Civil Rights Act

of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") and the New York State Human

Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL").  Defendant has moved for summary

judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56.  For the reasons that follow,

Defendant's motion is granted.

## BACKGROUND

The material facts, drawn from the Complaint and the parties' Local 56.1 Statements, are undisputed unless otherwise noted.

On January 1, 2004, the Department of Homeland Security ("DHS") contracted with FSSI[1] to provide operational and maintenance services[2] on Plum Island Animal Disease Center ("Plum Island").[3] Plum Island is located off the North Fork of Long Island and can only be accessed via ferry from docks located in Greenport, New York or Old Saybrook, Connecticut. Plum Island, as well as the two docks that service it, are the property of the DHS. Prior to the DHS contract with FSSI, the DHS contracted with North Fork Services Joint Venture ("North Fork") to provide support services on Plum Island.

North Fork employed Plaintiff, a Caucasian female, to work on Plum Island as a Hazardous Materials Technician. After FSSI contracted with the DHS on January 1, 2004, FSSI hired Plaintiff to work in the same position of Hazardous Materials Technician. Plaintiff's duties in this position included (i) performing laboratory and facility inspections; (ii) maintaining regulated medical waste storage area; (iii) maintaining waste manifests; (iv) performing smoke

_____

[1]FSSI is a subsidiary corporation owned and controlled by Arctic Slope Regional Corporation ("ASRC"). As of January 1, 2009, World Technical Services, Inc. ("WTSI") was formed to provide support services for the DHS on Plum Island. WTSI is a subsidiary of ASRC which it created by having FSSI absorb some services of another one of its subsidiaries, Arctic Slope World Services.

[2]The support services provided by FSSI include, but are not limited to, the following areas: buildings and grounds, transportation, safety/security, laboratories, utilities, technology, hospitality, and hazardous materials.

[3]The DHS has owned Plum Island since July 2003, and prior to that, it was under the control of the United States Department of Agriculture. Plum Island is a secure, strategic government facility whose scientists conduct basic and applied research and diagnostic activities to protect the United States livestock from foreign diseases.

readings; (v) regulating and disposing of medical waste; (vi) entering gas logs onto the computer; (vii) performing chemical inventories; (viii) decontaminating chemicals; (ix) removing chemicals; (x) preparing reports; (xi) collecting ash samples; and (xii) performing fuel stick readings.  While employed at FSSI, Plaintiff was required to continue her educational training as a Hazardous Materials Technician.

Matthew Raynes ("Raynes"), a FSSI Project Manager, created the position of Environmental Manager, and on June 21, 2004, promoted Plaintiff into this supervisory position with a concomitant 8% increase in salary and an increase in benefits.  Plaintiff's duties in this position included (i) managing and overseeing hazardous materials; (ii) managing and overseeing the regulated medical waste and universal waste; (iii) developing, implementing and updating procedures and programs; (iv) interacting with the various local, state and federal agencies; (v) managing the spill response team; (vi) supervising one employee; (vii) creating fuel tank reports; (viii) scheduling and directing daily work activities involving hazardous materials (hazardous waste, regulated medical waste and universal waste) to ensure compliance; (ix) directing, scheduling and conducting regulatory inventories as required; (x) coordinating and/or conducting remediation activities at the facility; (xi) ensuring compliance within facility departments and laboratories; (xii) developing plans of action including safety considerations, consistent with the local emergency response plan and the organization's standard operating procedures; and (xiii) ensuring adequate training companywide in support of site procedures and requirements.

On January 1, 2005, Raynes authorized a 3% increase in salary for Plaintiff.

When the Building and Grounds Manager position became available upon the

death of the supervisor in March 2005, Raynes promoted Plaintiff to the acting position on an interim basis and then promoted Plaintiff to the position on a permanent basis,[4] effective March 21, 2005. The promotion was accompanied by a 13% increase in salary and an increase in benefits. Plaintiff's duties in this position included: (i) managing a staff of employees[5] to assure the optimal functioning of building services;[6] (ii) overseeing contractors for facilities renovation projects; (iii) providing backhoe support to the Environmental Manager to clean up large oil or contaminated spills; (iv) providing support to the Environmental Manager in the removal of ash; (v) conducting fuel tank readings (until the duty was later transferred to the Environmental Manager); and (vi) training the employees she supervised to conduct fuel tank readings.

In March 2005, based upon Plaintiff's recommendation, Frank Sistare, an FSSI Wastewater Treatment Plant Operator[7], was promoted to Plaintiff's former position of Environmental Manager. For the first six months following his promotion, Raynes directed that Sistare would report to Plaintiff.

For several months after being promoted to Buildings and Grounds Manager,

---

[4]On March 2, 2005, Raynes issued a job posting for the permanent position of Buildings and Grounds Manager. Eight people applied for the permanent position of Buildings and Grounds Manager, and Plaintiff was the only female applicant.

[5]When Plaintiff became the Building and Grounds Manager, the staff that directly reported to her included: (i) one heavy equipment/truck operator; (ii) two carpenters/mason painters; (iii) two ground laborers; (iv) two trade helpers; and (v) two shipping/receiving clerks.

[6]Plaintiff was responsible for assigning tasks to the crew in the following order of priority: (i) assisting with nitrogen leaks; (ii) transporting the arriving animals on Plum Island; (iii) cleaning up fuel spills; (iv) replacing telephone poles; (v) repairing roads; and (vi) rendering assistance at the power plant.

[7]In 2003, Plaintiff had assisted Sistare in obtaining a position on Plum Island as a Wastewater Treatment Plant Operator. They had previously worked together for several years at the Montville Wastewater Treatment Plant.

Raynes instructed Plaintiff to maintain responsibility for fuel tank management, including conducting fuel tank stick readings and completing ten-day reconciliation reports. Although Plaintiff objected to the continued responsibility of the fuel tank measurements, Raynes directed Plaintiff to continue to oversee this area until Sistare was ready to assume that duty.

On January 1, 2006, Raynes authorized a 3% increase in salary for Plaintiff.

Later that year, in September 2006, Sistare took over the duties of oversight and management of the fuel usage reports and reconciliation. Within the first few days of assuming this responsibility, he and Norma Corwin, the Hazardous Materials Technician, identified a discrepancy in the reports that Plaintiff had filed with the DHS and the EPA relevant to fuel usage.[8] The significance of the discrepancy was that there existed a potential fuel leak into the soil, environment, groundwater and/or the seashore. Sistare immediately brought the issue to Raynes, and Raynes instructed Sistare to report the discrepancy to the DHS and the EPA.

### (a)     *The Bulb Crushing Demonstration Incident*

Sometime after September 12, 2006, Sistare conducted a demonstration of a new piece of equipment, a bulb crushing machine, for selected members of the FSSI management team. The presentation took place in the shredder room on the loading dock at Plum Island. There were up to seven managers present, including Raynes and Sistare.

On that day, Plaintiff drove up to the loading dock during the demonstration to confront Sistare about reporting her to the DHS and the EPA concerning the fuel tank reading

---

[8]Specifically, there was a greater than 30-gallon discrepancy between Plaintiff's fuel stick readings and the Veeder Root printout in two of the underground fuel storage tanks. The Veeder Root system contains leak detection probes that monitor whether there is any fuel leakage.

discrepancy.  Plaintiff interrupted Sistare's presentation to inform him that she had spoken to Tom Dwyer of the DHS and that it was "all set."  (Pl. Dep. 376.)  Sistare became irate and started yelling at her for bringing up the subject of fuel tank readings while he was demonstrating a new piece of equipment.  Sistare then walked away from her and went outside to the loading platform.  Plaintiff pursued Sistare outside to continue the confrontation and to find out "what was the matter with him."  (*Id.* at 380-81.)

Raynes followed Sistare and Plaintiff outside and directed them to report to his office.  Raynes then cancelled the presentation meeting.  In his office, Raynes told them both that their behavior was unacceptable and that they needed to get along.  He issued each of them a performance correction.

### (b)     The Request for Spill Absorbent Incident

On November 22, 2006, Plaintiff made a verbal request to Sistare for spill absorbent.  Sistare left to go to the hazardous waste room to get the absorbent for her.  After he left, one of Plaintiff's staff members, Roosevelt Jackson, told her that Sistare was walking down the hall, swearing about something.  Plaintiff called Sistare into her office and asked him why he was swearing.  In response, Sistare started yelling at her, and Plaintiff claims she feared for her safety.

Instead of calling security or Raynes to report the incident, Plaintiff called her husband, Denny Hyek, at work on his cell phone.  Crying into the phone, she left her husband a voice mail message that Sistare "blew up" at her.  (*Id.* at 450.)

Raynes received a radio call from Sistare about the verbal exchange.  Within a half hour of the incident, Raynes called Plaintiff and asked her to come to his office.  Plaintiff

went to Raynes' office, and he advised her that he would "take care of it." (*Id.* at 457.) Plaintiff returned to her office, had a telephone conversation with her husband, and informed him that Raynes said he would handle the matter.

During his investigation into the matter, Raynes interviewed Plaintiff, Sistare, and Jackson . Sistare told Raynes that he was upset because Plaintiff had previously refused to assist him with the ash removal and he was also upset that there was only one bag of spill absorbent left. By letter dated November 22, 2006, Raynes suspended Sistare for three days without pay "for actions unbecoming of a manager," advised Sistare that "[i]f he was unable to work with other managers and maintain [his] cool in public then [he] will need to find another place of employment." (Raynes Decl., ¶ 17, Ex. 6.) Raynes placed him on a 60 day "win/win program." (*Id.*)

Later that same day, and after, as noted above, Sistare had been suspended for three days without pay and had discussed his suspension with Raynes, a number of FSSI employees, including Plaintiff, Sistare and Raynes, boarded a ferry to leave Plum Island. As the ferry boat pulled into the dock at Old Saybrook, Connecticut, Plaintiff spotted her husband in the parking lot. Because her husband would not normally be at the boat dock, Plaintiff was "shocked" to see him and thought "he was upset" and "must have come to say something" to Sistare. (Pl. Dep. 467-68.) She anticipated that there would be trouble with her husband and was fearful of an unpleasant confrontation between her husband and Sistare because her husband had a "wild attitude," could loses his temper and could be explosive. (Pl. Dep. 472-83.) Plaintiff was aware that Denny Hyek owned two rifles and a pistol and could possibly have had a gun with him that day on the dock.

As Plaintiff walked off the boat, she approached her husband and asked him not to do anything. Denny Hyek gave her his paycheck, said he was just going to talk to Sistare, and told her to "just go." (*Id.* at 472.) Plaintiff walked away, got into her car, and drove to a local bar.[9] Although Plaintiff was concerned that there might be a serious confrontation between her husband and Sistare that could endanger them and other FSSI employees as well as innocent bystanders, she nevertheless left because "God leaded [her] that way." (*Id.* at 470.) Despite having a cell phone, Plaintiff did not call the police or Raynes nor did she return to the ferry to solicit assistance from Raynes or others in an effort to defuse the situation.

As they were walking off the ferry, Raynes and Sistare were again engaged in a conversation concerning Sistare's suspension without pay. Once Raynes made it clear there was nothing further to discuss, Sistare turned and walked ahead. Raynes saw Denny Hyek on the dock and noticed that Denny Hyek had blocked Sistare's truck with his own vehicle in the parking lot. As Sistare approached his vehicle, Denny Hyek said to him, "If you want to yell at somebody, yell at me." (Dennis Hyek Dep. 32-33.) Hearing raised voices and Denny Hyek saying to Sistare, "If it doesn't happen here fagot, it is going to happen at Home Depot,"[10] Raynes rushed over to them. After attempting to physically separate them, Raynes told Denny Hyek to "move away and get in your car and get out of here." (Raynes Dep. 114-15.)

Because the dock at Old Saybrook was leased by the DHS through FSSI, Raynes

---

[9]The record is not clear whether Plaintiff immediately drove to the bar or remained for a while at the scene. Plaintiff states that she may have sat in her car and watched the verbal altercation unfold between her husband and Sistare as well as with Raynes before driving to the bar. (Pl. Dep. 506; Pl.'s Response to Def.'s Stmt. of Undisputed Facts at ¶ 144.) Raynes asserts that during the altercation, he observed Plaintiff watching the incident. (Raynes Dep. 115.)

[10]Sistare worked a second job at Home Depot.

had to report the incident as a security infraction.  He called Chris Aiello to inform him of the matter who in turn called the head of the DHS security to brief him.  Later that day, Raynes received a voice mail from Plaintiff stating that she "understood if [Raynes] was to fire her," (Raynes Decl. ¶ 16; Pl. Dep., Ex. 26.)  During a phone conversation on November 24, 2006, Raynes discussed the incident with Plaintiff, told her that he had expected more from her with respect to preventing her husband from taking any actions, and Plaintiff told Raynes that he should have told her that he had suspended Sistare.  Raynes documented the incident and his follow-up conversation with Plaintiff.

### (c) *Plaintiff's Choice of Resignation or Termination*

Thereafter, following the altercation at the Old Saybrook dock, Raynes decided to terminate and/or ask Plaintiff for her resignation.  Raynes believed that Plaintiff should have remained at the dock to prevent her husband from confronting Sistare, should have gone back to the ferry to inform Raynes of the situation and to seek his help, or should have sought the assistance of others to prevent the threat of danger.  Raynes reported the incident on the dock to the FSSI Operations Manager, Jerry LeBeau, and to the Human Resource Administrator, Carin Reinhardt, and informed them of his decision to terminate Plaintiff and/or request her resignation.

On November 27, 2006, Plaintiff resigned from employment with FSSI.

### (d) *The Instant Action*

Plaintiff initiated the instant action on November 16, 2007.  Her Complaint asserts two causes of action, viz. gender discrimination under Title VII and gender discrimination under the NYSHRL.  FSSI has moved for summary judgment.  For the reasons

stated below, FSSI's motion is granted and this case is dismissed in its entirety.

## *DISCUSSION*

### I.     *Summary Judgment Standard*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law.  *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008); *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009); *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  *See SCR Joint Venture*, 559 F.3d at 137; *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried.  *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).  The non-movant must present more than a

"scintilla of evidence," *Del. & Hudson Ry. Co. v. Cons. Rail Corp.*, 902 F.2d 174, 178 (2d Cir.

1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material

facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the

allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits

supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.

1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must

be based on personal knowledge, must "set forth such facts as would be admissible in evidence,"

and must show that the affiant is "competent to testify to the matters stated therein." *Patterson

v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). "Rule

56(e)'s requirement the affiant have personal knowledge and be competent to testify to the

matters asserted in the affidavit also means that an affidavit's hearsay assertion that would not be

admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."

*Patterson*, 375 F.3d at 219 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155,

160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge

must bear in mind the actual quantum and quality of proof necessary to support liability," or "the

substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55.

A district court considering a summary judgment motion must also be "mindful of the

underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th

Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the

respective parties will bear at trial guide the district court in its determination of a summary

judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where

the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving

party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to

support an essential element of the non-movant's claim. *See id.* at 210-11. Where a movant

without the underlying burden of proof offers evidence that the non-movant has failed to

establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her]

claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). In

deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all

reasonable inferences in favor of the non-moving party. *See Donahue v. Windsor Locks Bd. of*

*Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987).

Summary judgment is generally inappropriate where questions of the defendant's

state of mind are at issue, *Gelb v. Board of Elections of the City of New York*, 224 F.3d 149, 157

(2d Cir. 2000), and should thus be granted with caution in employment discrimination cases.

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006); *see Carlton v. Mystic Transp.,*

*Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains available to

reject discrimination claims in cases lacking genuine issues of material fact." *Schiano,* 445 F.3d

at 603 (internal quotation marks and citations omitted); *see Chambers v. TRM Copy Ctrs. Corp.*,

43 F.3d 29, 40 (2d Cir. 1994). "The summary judgment rule would be rendered sterile . . . if the

mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise

valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of

summary judgment — avoiding protracted, expensive and harassing trials — apply no less to

discrimination cases than to commercial or other areas of litigation." *Id.* "When no rational jury

could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *see also Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

## II.     *Title VII Claims*

Title VII prohibits an employer from discriminating against any individual "with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S. § 2000e-2(a)(1); *see Richardson v. Commission in Human Rights & Opportunities*, 532 F.3d 114, 119 (2d Cir. 2008).

Plaintiff brings claims under Title VII for employment discrimination based on gender.  In particular, Plaintiff contends that Defendant's decision to terminate[11] her following her husband's altercation with a co-worker at the Old Saybrook dock was a pretext for gender discrimination, including disparate treatment relating to gender.

"A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that [she] has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment." *Feingold v. New York,* 366 F.3d 138, 149 (2d Cir. 2004).  Liability in a disparate

---

[11]The record is undisputed that Plaintiff was asked to resign and if she had declined, she would have been terminated.  Thus, for purposes of this motion, Plaintiff's cessation of employment will be referred to as "termination."

treatment action under either theory, "depends on whether the protected trait actually motivated the employer's decision." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003).

### A.    *McDonnell-Douglas Burden Shifting Framework*

Since Plaintiff has not presented any evidence directly reflecting a discriminatory animus, the Court reviews Plaintiff's claim under the framework set forth by the Supreme Court in *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 802-04 (1973).  In *McDonnell-Douglas*, the Supreme Court first enunciated the now-familiar "burden-shifting" formula used in analyzing Title VII employment discrimination claims based on indirect or circumstantial evidence.  This standard was further refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-11 (1993).

Under *McDonnell-Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell-Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination vel non," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).  Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Id.*

The burden of establishing a prima facie case of employment discrimination has

been described as "modest," *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994), or even "minimal." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves*, 530 U.S. at 143.

Likewise, the employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia*, *Meiri*, 759 F.2d at 995 (2d Cir. 1985)), *aff'd*, 99 Fed. Appx. 350 (2d Cir. 2004). Federal courts do not have a "roving commission to review business judgments," *Mont. v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n.8 (7th Cir. 1987)), and may not "sit as super personnel departments, assessing the merits — or even the rationality — of employers' non-discriminatory business decisions." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991). Thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

In order to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995); *see*

*Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004). A discrimination claimant may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bombero v. Warner-Lambert Co.*, 142 F. Supp. 2d 196, 203 n.7 (D. Conn. 2000) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999), and citing *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)), *aff'd*, 9 Fed. Appx. 38 (2d Cir. 2001).

However, to rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri*, 759 F.2d at 998.

With these precepts in mind, the Court shall now examine Plaintiff's Title VII allegations of gender discrimination based on her claims of disparate treatment and harassment.

### B. Plaintiff Has Failed to Establish a Prima Facie Case of Gender Discrimination Based on Disparate Treatment

To establish a prima facie case of gender discrimination under Title VII,[12] a plaintiff must show that: (1) she belonged to a protected class, (2) was qualified for the position she held or sought, (3) suffered an adverse employment action, (4) under circumstances giving

---

[12]The same standards apply to Plaintiff's claims of gender discrimination under the NYSHRL. *See Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).

rise to an inference of discriminatory intent. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).

For purposes of this motion, Defendant does not dispute that Plaintiff has established the first three elements of her prima facie case, viz. that she was a member of a protected class, she was qualified for the position at issue, and that her termination constitutes an adverse employment action. Defendant does dispute, however, whether Plaintiff's termination occurred under circumstances giving rise to an inference of discriminatory intent. The Court agrees.

Although "[t]here is no rigid rule about what circumstances allow an inference of discrimination," *Citroner v. Progressive Cas. Ins. Co.*, 208 F. Supp. 2d 328, 341 (E.D.N.Y. 2002), such circumstances include "actions or remarks made by decision makers that could be viewed as reflecting a discriminatory animus, preferential treatment given to employees outside the protected class, . . . or a pattern of recommending the plaintiff for positions for which he or she is not qualified and failure to surface plaintiff's name for positions for which he or she is well-qualified." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996) (internal citations omitted).

Plaintiff avers that an inference of discriminatory intent may be established through record evidence of disparate treatment (1) in the terms and conditions of her work environment, including equipment, training and enforcement of policies, and (2) in the terms of her employment, including her termination for violating FSSI's standards of employee conduct[13]

---

[13]FSSI's Employee Handbook sets forth standards of conduct and behavior which govern its employees and states in relevant part:

FSSI expects its employees to be responsible for their own actions and to maintain standards of conduct and behavior that reflect the Corporation's values

while no such disciplinary action was taken against a similarly situated male co-worker.

> **(1)     Plaintiff's Claims of Disparate Treatment With Respect to Equipment, Training and Enforcement of Policies Fail to Establish an Inference of Discrimination Based on Gender**

Under Title VII, discrimination may be established through evidence of "disparate treatment," which focuses on "how an individual was treated compared to her similarly situated co-workers."  *Smith v. Xerox Corp.*, 196 F.3d 358, 370 (2d Cir. 1999); *see International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977).  To demonstrate disparate treatment, "the plaintiff is required to prove that the defendant had a discriminatory intent or motive."  *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1041 (2d Cir. 1993) (internal quotation marks and citation omitted).  In the instant action, Plaintiff's claims of

---

and well-earned reputation.  It is your responsibility to make sure you understand the performance and behavior standards expected of you, and to conduct yourself accordingly.  If you have any questions, see your manager or the Human Resources Director.

FSSI follows the practice of "progressive discipline" when dealing with workplace infractions, and any unacceptable behavior.  However, in some cases, immediate discharge or suspension may be warranted.  Each case is judged on its own merits and facts.  Examples that may result in immediate dismissal are:

- Fighting
- Possession/use of illegal drugs or alcohol
- Possession of firearms/explosives on Company property
- Theft/dishonesty
- Falsifying records
- Willful damage of Company property or another employee's property
- Threats against management/other employees
- Committing felony offenses

(Pl. Dep., Ex. 9.)

disparate treatment in the terms and conditions of her work environment[14] fail to give rise to an inference of discrimination based on gender because the record is devoid of any evidence that Plaintiff was treated unfairly.

### *(a)    Equipment*

Plaintiff alleges that FSSI's issuance of an "old," "big," "clunky" laptop computer to use when she was promoted to Environmental Manager was discriminatory because "all the other managers had a nice, thin, sleek one and mine was this big old dinosaur." (Pl. Dep. 67, 69, 71.) A review of the record reveals, however, that there is no evidence to support this purely conclusory claim first broached at her deposition.

The undisputed evidence shows that when Plaintiff requested a new laptop from Raynes, he authorized her to select the one that she wanted which was the same, albeit, a "thinner, sleeker model," than the other managers used. (*Id.* at 60, 62, 67, 181-82.) When she received the new laptop, Plaintiff's "old and clunky" computer was given to Sistare, a male co-worker. Moreover, Plaintiff had access to a desktop computer throughout her employment with FSSI. Further, when Plaintiff asked Raynes for a memory stick for the laptop computer so that she could work from home, he purchased one for her. Thus, Plaintiff's claim of disparate treatment based on the issuance of equipment at FSSI fails to support an inference of discrimination.

### *(b)    Training*

---

[14]Plaintiff's opposition to FSSI's motion for summary judgment with respect to her gender discrimination disparate treatment claims based on unequal terms and conditions of her work environment consists of nothing more than unsubstantiated statements culled from her deposition testimony.

Plaintiff contends that an inference of discrimination based on her gender may be established from Defendant's failure to provide her with the necessary training to succeed in her positions at FSSI. This conclusory contention is belied by the record evidence.

A review of the record indicates that Plaintiff acknowledged that she was provided numerous opportunities at FSSI for technical training in her various positions, had successfully completed approximately 17 courses while employed at FSSI, and was awarded numerous certificates evidencing the same. (Pl. Dep. 226-36, 308, 335-59; Ex. 15-18, 22.) Moreover, Plaintiff conceded that she was trained by Ross Norklun, the previous Building and Grounds Manager, on how to conduct fuel tank readings throughout her positions at FSSI, and that she in turn had trained other subordinate employees on how to perform the readings. (*Id.* at 259-264, 306-07.) Plaintiff also admitted she had manuals and access to websites available to assist her with additional instruction when needed during her employment with FSSI. (*Id.* at 349-56, 362-63; Ex. 16-18.) Finally, there are no allegations set forth in the complaint concerning disparate treatment with regard to training. As previously noted, Plaintiff's claim of disparate treatment on this basis first surfaced at her deposition, and notably she never alleged at her deposition that her male co-workers were given better or different training than she received. Accordingly, Plaintiff's claim of disparate treatment based on the lack of training fails to evince an inference of gender discrimination.

### (c)      *Enforcement Policies*

Plaintiff claims that the selective enforcement of FSSI's policies against her demonstrates an inference of gender discrimination. Aside from her conclusory assertions gleaned solely from her deposition testimony that Raynes selectively enforced policies against

her when he (i) permitted male managers to work from home and disallowed her to do the same, (ii) assigned less work to male managers than to Plaintiff, and (iii) directed her to remove ash with a box truck which transported food, but did not request the same of Sistare, (Pl. Dep. 517-18.), Plaintiff has not proffered any additional facts or evidence to support these claims.[15]

With respect to her claim that the policies were selectively enforced against her because male managers were able to work from home but she was not, Plaintiff admits in her deposition testimony that she did not have any direct information and relied solely on what two employees had "told" her. (*Id.* 520-22.) Plaintiff's claim that she was assigned more work than her male co-workers is based on her observations at Plum Island that "[t]here were occasions when you could see one of them outside smoking all day long." (*Id.* 517-18.)

Finally, Plaintiff alleges that practices were selectively enforced against her because Raynes requested that she, but not Sistare, remove ash with a box truck.[16] This conclusory allegation only surfaced for the first time at her deposition, and her testimony relative to this claim was as follows:

> Q Well, you are saying – what do you mean by saying
> 'selective enforcement of policies.' What does this
> mean?
>
> A Well, he didn't tell Frank to go move ash with a box
> truck which transported food. You know, we
> helped out when we could, the best we could. I just
> think there were things that he asked me to do that I

---

[15]The complaint is less than illuminating in this regard and merely states in a conclusory manner that "Plaintiff was treated disparately because policies and practices were selectively enforced against her during his [sic] employment with Defendant." (Compl. ¶ 17.).

[16]Plaintiff concedes that providing support in the proper removal of ash was within her job responsibilities as the Buildings and Grounds Manager. (*Id*. at 392, 398.)

shouldn't have done.

(*Id.* 517.)  Significantly, Plaintiff never identified the source for her information regarding the interaction, or lack thereof, between Raynes and Sistare on ash removal, and her assertion appears to be rooted in hearsay.  *Cf. Siegel v. Metro-North Commuter R.R. Co.,* No. 07 Civ. 6025 (DC), 2009 WL 889985, at *2 (S.D.N.Y. Apr. 1, 2009) (noting "the Court cannot consider hearsay on a motion for summary judgment").  In short, Plaintiff's selective enforcement claims are not supported by admissible evidence, and without more, are insufficient to establish an inference of gender discrimination.

### (2)    *Plaintiff's Claim of Disparate Treatment With Respect to Her Termination Fails to Raise an Inference of Discrimination Based on Gender*

Plaintiff posits that an inference of discrimination based on gender can be established by evidence that a similarly situated employee, Sistare, was not terminated, despite having engaged in the same violations of employee conduct for which she was terminated. Indeed, in her opposition papers, Plaintiff avers that she "was terminated [for] a similar act that a male co-worker received a mere suspension."  (Pl.'s Mem. of Law in Opp. at 5.)  In support of her disparate treatment claim, Plaintiff proffers two incidents involving Sistare, to wit (1) the "Bulb Crushing Demonstration" incident and (2) the "Request for Spill Absorbent" incident.

"A showing of disparate treatment – that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside the protected group – is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation marks and citation omitted) (italics in original).  However, a plaintiff who seeks to establish her

prima facie case in this manner must show that the employee to whom she compares herself is "similarly situated in all material respects."  *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001).  In this context, the Second Circuit has explained:

> What constitutes "all material respects". . .  varies somewhat from case to case and, . . . must be judged based on (1) whether the plaintiff and those [she] maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. . . .  Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical. . . .  The determination that two acts are of comparable seriousness requires--in addition to an examination of the acts--an examination of the context and surrounding circumstances in which those acts are evaluated.

*Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (internal quotation marks and citations omitted); *see also Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 95-96 (2d Cir. 1999) ("[i]n order for employees to be similarly situated for the purposes of establishing a plaintiff's prima facie case, they must have been subject to the same standards governing performance evaluation and discipline and have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or appropriate discipline for it") (internal quotation marks and citation omitted).

"The question of whether two employees are similarly situated is generally a triable issue for the fact finder.  Nonetheless, a plaintiff must offer sufficient evidence from which a jury could reasonably conclude that there was indeed disparate treatment of similarly situated employees."  *Pierre v. New York State Dep't of Correctional Servs.*, No. 05 Civ. 0275 (RJS), 2009 WL 1583475, at *12 (S.D.N.Y. June 1, 2009) (internal quotation marks and citations omitted); *see Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499-500 n.2 (2d Cir. 2001)

"This rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assoc.*, 273 F.3d at 499-500 n.2.

### (a)    The Bulb Crushing Demonstration Incident

With regard to the first incident, Plaintiff has raised no triable issue of fact as to whether Plaintiff and Sistare were disparately treated.[17]

A review of the record demonstrates the following.  Plaintiff interrupted a demonstration of new equipment given by Sistare and another co-worker to senior management on Plum Island in order to confront Sistare about his report to the DHS and the EPA regarding her discrepancy in the fuel measurement reports.  (Pl. Dep. 376-84.)  Plaintiff admits she interrupted the presentation to discuss the discrepancy and asserts that in response to the interruption, Sistare became irate, yelled at her, and walked outside to the loading platform.  (*Id.*)  Nevertheless, Plaintiff followed Sistare outside to find out "what was the matter with him."  After witnessing the verbal altercation, Raynes called both Plaintiff and Sistare into his office and stated:

> I'll have – you know, that behavior is unacceptable and if that happens again between you two, I'll have both of your heads on a platter.  You two need to get along.

(*Id.* at 374-75, 386-90; Raynes Dep. 76, 89-91, 97.)   Raynes then issued a performance correction to both of them.  (*Id.*)

Plaintiff admits in her deposition testimony that it had been inappropriate for her

---

[17]Plaintiff's opposition to FSSI's summary judgment motion with respect to her gender discrimination disparate treatment claim based on the bulb crushing demonstration incident consists solely of statements culled from her deposition testimony.

to interject herself into the demonstration that Sistare was conducting in order to address an unrelated, potentially argumentative subject. (Pl. Dep. 378-79.) More importantly, Plaintiff concedes that she had equal culpability with respect to her actions at the bulb crusher demonstration and that both she and Sistare were disciplined in the same manner. (Pl.'s Response to Def.'s Statement of Undisputed Facts, ¶¶ 108-09; Pl. Dep. 455.) Under these circumstances, a reasonable jury could not conclude that Plaintiff was disparately treated when compared to Raynes' treatment of Sistare nor infer that Plaintiff was discriminated against based on her gender.

### *(b)* *The Request for Spill Absorbent Incident*

With respect to the second incident, Plaintiff again fails to show that the circumstances she alleges give rise to an inference of gender discrimination. In support of her allegation of disparate treatment, Plaintiff urges that she, a female, was forced to resign rather than be terminated from FSSI, while a male co-worker, Sistare, was merely suspended without pay for three days for she proffers to be the same employee conduct. Although there is record evidence that both Plaintiff and Sistare were managers at FSSI, reported to the same supervisor, and were subject to the same workplace standards, an examination of the context and surrounding circumstances underlying Sistare's suspension and Plaintiff's termination fails to show that she and Sistare were "similarly situated in all material respects."

### *(i)* *Sistare's Suspension*

As previously recounted, the evidence that documents Sistare's suspension is as follows. On November 22, 2006, Plaintiff requested spill absorbent from Sistare and heard from one of her staff members, Roosevelt Jackson, that Sistare "was walking down the hall kicking

and swearing about something." (Pl. Dep. 444-46.)  Plaintiff called Sistare into her office, asked

him why he was swearing, and in response, Sistare blew up at her, causing her to fear for her

safety. (*Id*. at 446-47.)

Instead of calling Raynes or security, Plaintiff called her husband and left him a

distraught voice message that Sistare had verbally blown up at her. (*Id*. at 450-51; Dennis Hyek

Dep. at 14-15.)  Within a half-hour, having been notified about the incident by others, Raynes

called Plaintiff, asked her to come to his office, and advised her that he would "take care of it."

(Pl. Dep. at 457.)  There is record evidence that Plaintiff thereafter spoke to her husband and

informed him that Raynes was going to take care of the problem. (Dennis Hyek Dep. at 18.)

Raynes then separately called Sistare into his office, suspended him for three days without pay,

and placed him on a "win/win agreement."[18] (*Id*. at 496.)  Plaintiff concedes that no disciplinary

action was taken against her as a result of incident. (*Id*.)

If nothing further had occurred between Plaintiff, Sistare and Raynes on the

morning of November 22, 2006, the undisputed facts surrounding Sistare's suspension were that

(i) Sistare and Plaintiff were involved in a verbal altercation; (ii) Raynes immediately called each

of them into his office separately to address the issue; (iii) Raynes advised Plaintiff that he would

handle the matter; (iv) Sistare was disciplined and suspended for three days without pay; and (v)

no disciplinary action was taken against Plaintiff.

### *(ii)      Plaintiff's Termination*

A review of the evidence that documents the context underlying Plaintiff's

---

[18]Plaintiff states that she did not find out about Sistare's suspension until several days
after the incident. (*Id*. at 495.)

termination is as follows.  Later that day, on November 22, 2006, when the Connecticut bound

ferry carrying Plaintiff and other employees from Plum Island pulled into the Old Saybrook

dock, Plaintiff observed her husband in the parking lot.  In her deposition testimony, Plaintiff

stated, as noted earlier, that she was shocked to see her husband, that his presence on the dock

was unusual, and she was fearful of a confrontation between her husband and Sistare.  (Pl. Dep.

at 461-70.)  Plaintiff also conceded that the basis for her reaction was that her husband had a

"wild attitude," "can lose his temper," can be explosive, owned two rifles and a pistol and could

possibly have had a gun with him in the parking lot.  (*Id*. at 469-71, 482-83, 486, 509.)

Plaintiff averred that when she approached her husband, she spoke to him, asked

him not to do anything, and left after he instructed her to go.  There is record evidence that

Plaintiff was aware that she had options available to her to ensure the safety of others from a

confrontation with her husband, but for some unexplained reason did not pursue them.[19]  At her

deposition, Plaintiff testified as follows:

> Q        You knew your husband had an explosive temper.
>          You knew he had a wild side.  He tells you to leave.
>          He was waiting for Sistare to get off the boat and/or
>          Raynes.  You walk away 15 car lengths, get in you
>          car make a left, and get out of the parking lot.
>          Correct?
>
> A        Yes
>
> Q        Did you have any concern whatsoever in your mind

_____

[19]For example Plaintiff acknowledged that (i) she had a cell phone with Raynes' cell
phone number programmed into it, but she did not call him even though she knew he was still on
the ferry; (ii) despite having a cell phone, she did not call the police; and (iii) while she could
have returned to the ferry to seek assistance from Raynes or others or to warn her co-employees
of the situation, she failed to do so.  (*Id*. at 476-80.)

> that there might be a serious confrontation at that point that would endanger your husband, Frank, Matt, any innocent bystander on the boat, any deckhand, anybody?
>
> A    Absolutely
>
> Q    Well you left. Did you warn anybody?
>
> A    At that point, you know, being under the emotional duress, I was in – God leaded me that way.

(Pl. Dep. 478-79. )

Despite her awareness of her husband's proclivities and the potential threat of harm to her co-workers and others, Plaintiff admitted that she walked away, got into her car and drove from the scene to a bar. More significantly, Plaintiff acknowledged that her conduct, in abandoning her location, getting in her car, pulling away and placing a co-worker and possibly others in danger by her husband, was a violation of the workplace conduct rule against "threats against management and other employees." (Pl. Dep. 511-13; Ex. 9.) Finally, the undisputed evidence indicates that (i) Plaintiff left Raynes a voicemail after the incident that she understood if he fired her and that he should have told her that he had suspended Sistare; (ii) Raynes believed Plaintiff had control over the situation; (iii) following the altercation at the Old Saybrook dock, Raynes decided to terminate and/or ask Plaintiff for her resignation; and (iv) that Raynes told her he decided to terminate her because she "didn't turn around and go back" to stop her husband or to get help. (Pl. Dep. at 494, 511; Pl. Dep. Ex. 26; Raynes Dep. 127-28.)

Under these circumstances, the Court cannot conclude that a reasonable jury could find the similarly situated requirement was met. Which is to say, Plaintiff's attempt to equate (i) the conduct surrounding the verbal altercation which occurred on the morning of

November 22, 2006 and resulted in Sistare's suspension with (ii) the conduct which occurred later that same day at the Old Saybrook dock for which she was terminated, lacks merit as a matter of law.

Moreover, Plaintiff's claim that "Defendant has routinely been placed on notice about problems between Mr. Sistare and [his] fellow co-workers" in order to establish that she and Sistare were "similarly situated" is unavailing. (Pl.'s Mem. in Opp. at 7.) Plaintiff states that Roosevelt Jackson and Norma Corwin complained to Raynes about Sistare's "harsh treatment of them," however, Raynes deposition testimony statement in this regard reflected that there were "complaints" made, and states as follows:

> Q.    Has any employee of FSSI made any complaints to
>       you about Mr. Sistare besides Ms.Hyek?
>
> A     Norma Corwin
>
> Q     Anybody else?
>
> A     Roosevelt Jackson

(Raynes Dep. at 101.)

With regard to the first employee, Roosevelt Jackson, Plaintiff's allegation that Jackson has been subjected to "verbal abuse, swearing and physical attacks," is not supported by any citation to the record, and Plaintiff admitted that she did not witness the alleged occurrence. (Pl.'s Dep. 446, 451.) Raynes' deposition testimony indicates that this complaint referred to the spill absorbent incident of the morning of November 22, 2006, and that Jackson's complaint was that Sistare had "slammed a door in his face and was swearing and walking around Building W." (*Id.* at 102.) Jackson's complaint was part and parcel of Raynes' decision to suspend Sistare for three days without pay.

When asked about the second employee, Norma Corwin, Raynes responded as follows:

Q      Do you recall what Norma specifically told you about Mr. Sistare?

A      Specifically? No

Q      Generally.  Just that he was not treating her well?

A      I can't speculate even in generalities.

(*Id.*)  Following Raynes' investigation into Corwin's complaint, Raynes stated that he "separated" Sistare from Corwin, "changed [his] job duties," "made it so that he was no longer an environmental manager," and "moved him inside the lab."  (*Id.*)  This incident occurred after Plaintiff was terminated and therefore is not indicative of the comparable seriousness of Sistare's conduct leading up to the time of Plaintiff's termination.

Finally,  Raynes' earlier favorable treatment of Plaintiff and the "same actor" doctrine[20] significantly undermine Plaintiff's claim that gender played a role in her termination. The undisputed evidence indicates that Raynes promoted Plaintiff on multiple occasions as well as authorized numerous increases in salary.  The record is clear that on June 21, 2004, Raynes promoted Plaintiff from a staff position as a Hazardous Materials Technician to Environmental Manager, a position that had not existed before and one that Raynes specifically created for her. (Pl. Dep. 61, 69, 223-43, 359; Def. 56.1 Stmts. ¶¶ 29-32.)  The promotion was accompanied by an increase in salary and supervisory responsibilities.  (*Id.*)   In less than a year, Raynes authorized another salary increase for Plaintiff in January 2005.  (Raynes Decl. ¶ 11, Ex. 2; Def. 56.1 Stmt. ¶ 35.)  In March 2005, upon the death of the Buildings and Grounds Manager, Raynes

_____

[20]Notably, Plaintiff fails to address or oppose this argument made by Defendant.

again promoted her to acting Buildings and Grounds Manager. (Pl. Dep. 250, 300, 359, 367; Raynes Dep. 60, 71; Def. 56.1 Stmts. ¶ 36.) Raynes thereafter issued a job posting for the permanent position of Buildings and Grounds Manager, received eight applications, and on March 21, 2005, selected Plaintiff, the only female applicant, for the position. (Pl. Dep. 225, 241, 250, 252, 301, 367, 518-19; Raynes Decl. ¶¶ 13-15; Def. 56.1 Stmts. ¶¶ 37-41.) The promotion was accompanied by an increase in salary and supervisory responsibilities. (*Id.*) Again, in less than a year later, Raynes authorized an increase in salary for Plaintiff in January 2006. Thus, Raynes' favorable treatment of Plaintiff throughout her employment with FSSI diminishes an inference of discriminatory animus associated with her termination. *See Inganamorte v. Cablevision Sys. Corp.,* No. 03-CV-5973 (DRH)(WDW), 2006 WL 2711604, at *14 (E.D.N.Y. Sept. 21, 2006) (finding an inference of discriminatory animus diminished when considered in light of defendant's treatment of women in the department).

The Second Circuit has explained that under the "same actor" doctrine there are certain factors that "strongly suggest that invidious discrimination was unlikely. For example, when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir. 1997); *see Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 138 (2d Cir. 2000). Because Raynes was the individual responsible for both the creation and promotion of Plaintiff to multiple managerial positions at FSSI as well as the individual responsible for the decision to terminate Plaintiff, the "same actor inference" applies and provides an inference that discrimination was not a motivating factor in Raynes' employment decision to terminate Plaintiff. *See Grady,* 130 F.3d at 560; *see Stouter v.*

*Smithtown Cent. School Dist.,* No. CV 07-2707(ETB), 2010 WL 520628, at *7 (E.D.N.Y. Feb. 12, 2010) ("A plaintiff's being hired and fired by the same manager is a highly relevant factor suggesting that invidious discrimination was unlikely") (internal quotation marks and citations omitted).

While the last promotion occurred well over a year prior to Plaintiff's termination, the Court notes that Raynes nonetheless authorized a salary increase well within a year prior to her discharge. In any event, the same actor inference remains significant and "strongly suggests that invidious discrimination was unlikely." *Id.*; *see Byrne v. CNA Ins. Co.,* No. 98-CV-885, 2001 WL 35934593, at *8 (N.D.N.Y. 2001) (holding that "[w]hile the last promotion occurred well over a year before plaintiff's termination, the inference created under the doctrine remains significant" and granting defendant's motion for summary judgment on plaintiff's employment discrimination claim); *Campbell v. Alliance Nat'l Inc.,* 107 F. Supp. 2d 234, 248 (S.D.N.Y. 2000) (holding in the summary judgment context that the same actor inference remains significant where the interim period is under two years); *see also Sharon Council v. Tri-Star Const. Co.,* No. O1 Civ. 11788 (BSJ), 2004 WL 253298, at *3 (S.D.N.Y. 2004) (granting defendant's motion for summary judgment and finding that where "as here, the interim period is under two years, the same actor inference remains significant"); *cf. Carlton*, 202 F.3d at 138 (finding seven years between hiring and termination significantly weakens the inference).

In summary, because Plaintiff has not submitted evidence that her termination occurred under circumstances giving rise to an inference of discrimination, her prima facie case of gender discrimination under Title VII fails. Accordingly, Defendant's motion for summary

judgment on this claim is granted.

**C.    *Plaintiff Has Abandoned Her Hostile Work Environment Claim Based on Harassment***

Defendant seeks summary judgment with respect to Plaintiff's gender discrimination claim on the basis that the two incidents of harassment involving Sistare, viz. (1) the Bulb Crushing Demonstration incident, and (2) the Request for Spill Absorbent incident, are insufficient to establish a hostile work environment[21] as a matter of law.  In her opposition papers, Plaintiff fails to provide any response to these arguments.

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."  *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (citing *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases); *accord Santiago v. City of New York*, No. 05-CV-3668 (RRM)(VVP), 2009 WL 935720, at *11 n.19 (E.D.N.Y. Mar. 31, 2009) (finding First Amendment retaliation claim abandoned by virtue of plaintiff's failure to pursue such a claim in her opposition papers); *Sorto-Romero v. Delta Int'l Machinery Corp.*, No. 05-CV-5172 (SJF)(AKT), 2007 WL 2816191, at *9 (E.D.N.Y. Sept. 24, 2007) (finding claim "abandoned by virtue of his failure to address [it] in his memorandum responding to defendant['s] summary judgment motion"); *Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n. 11 (S.D.N.Y.) (finding plaintiff's failure to provide arguments in

_____

[21]In the Complaint, Plaintiff does not use the term "hostile work environment" to set forth her claim of discrimination, but rather couches her claim in terms of "harassment."  (Compl. ¶¶ 13, 16.)  Although seemingly Plaintiff is attempting to assert a hostile work environment claim based on harassment, regardless of the label she uses, Plaintiff never addressed the claim or provided any opposition to Defendant's motion for summary judgment on this claim.

-33-

opposition to defendant's motion "provides an independent basis for dismissal" and "constitutes abandonment of the issue"), *aff'd* 130 F.3d 1101 (2d Cir. 1997); *see Wecare Holdings, LLC v. Bedminster Int'l Ltd.,* No. 08-CV-6213, 2009 WL 604877, at *8 (W.D.N.Y. Mar. 9, 2009) (granting summary judgment based on failure to address arguments in opposition papers and deeming claims abandoned); *Brodsky v. Trumbull Bd. of Educ.,* No. 3:06 CV 1947 (PCD), 2009 WL 230708, at *9 (D. Conn. Jan. 30, 2009) (granting summary judgment in favor of defendants where plaintiffs failed to address defendants' arguments with respect to plaintiffs' First Amendment retaliation claim, malicious prosecution claim and statutory claim on the grounds that "[p]laintiffs' failure to address [defendants'] arguments in their opposition papers constitutes abandonment of the claims"); *Santiago v. Newburgh Enlarged City Sch. Dist.,* 485 F. Supp. 2d 327, 338 (S.D.N.Y. 2007) (dismissing plaintiff's retaliation claim that she was terminated for complaining about discrimination because she failed to address defendant's argument that summary judgment should be granted in his favor on this claim); *Bellegar de Dussuau v. Blockbuster, Inc.,* No. 03-CV-6614 (WHP), 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006) (deeming claim abandoned based on plaintiff's failure to address claim in opposition to defendant's summary judgment motion); *see also* Local Civ. Rule 7.1 ("[A]ll oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon . . . in opposition to the motion. . . .  Willful failure to comply with this rule may be deemed sufficient cause for the . . . granting of a motion by default.").

        In the instant case, Defendant moved for summary judgment on Plaintiff's hostile work environment claim based on harassment, but Plaintiff failed to address any of Defendant's arguments regarding this claim.  The Court therefore deems Plaintiff's hostile work environment

claim abandoned and grants summary judgment in favor of Defendant with respect to this claim.

## III.   *Plaintiff's New York State Human Rights Law Claims Are Dismissed*

As mentioned previously, Plaintiff also claims that FSSI violated the NYSHRL. This claim too, must fail.

Discrimination "claims under the NYSHRL are analyzed identically to claims under . . . Title VII," and "the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII." *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.,* 461 F.3d 134, 141 (2d Cir. 2006); *accord Zacharowicz v. Nassau Health Care Corp.,* 177 Fed. Appx. 152, 155 (2d Cir. 2006); *Schiano v. Quality Payroll Sys. Inc.,* 445 F.3d 597, 609 (2d Cir. 2006). Thus, NYSHRL claims are generally considered "in tandem" with Title VII claims, *see Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n.1 (2d Cir. 1999), and a district court need not explicitly evaluate a plaintiff's NYSHRL claims where it has thoroughly analyzed the plaintiff's Title VII claims. *Smith*, 196 F.3d at 363 n.1. In the present case, as Plaintiff has failed to state an employment discrimination claim under Title VII, she has ipso facto failed to state these claims under the NYSHRL as well.

## CONCLUSION

For all of the above reasons, Cablevision's motion for summary judgment is GRANTED as to all of Plaintiff's claims, and this case is accordingly DISMISSED in its

entirety.  The Clerk of Court is directed to CLOSE this case.

**SO ORDERED.**

Dated: March 24, 2010
      Central Islip, New York
                                       /s_____
                                       Denis R. Hurley,
                                       United States District Judge